# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 10, 2007

## STATE OF TENNESSEE v. ANTONIO OLIVER

**Appeal from the Criminal Court for Shelby County**
**No. 04-08346     James C. Beasley, Jr., Judge**

---

**No. W2006-01736-CCA-R3-CD  - Filed October 30, 2007**

---

The defendant, Antonio Oliver, was convicted by a Shelby County Criminal Court jury of first degree murder. He was sentenced as a violent offender to life in the Department of Correction. In this direct appeal, he claims that insufficient evidence exists to support his conviction and that he is entitled to a new trial based upon prosecutorial misconduct during voir dire, opening statement, and closing argument. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which DAVID G. HAYES and ALAN E. GLENN, JJ., joined.

William D. Massey and Lorna S. McClusky, Memphis, Tennessee (on appeal); and Coleman W. Garrett and Jocelyn V. Henderson, Memphis, Tennessee (at trial), for the appellant, Antonio Oliver.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and James A. Wax, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

At the trial, Sterling Ratliff testified that the victim, Michelle Lynn Ratliff Berry, was his daughter. He said she was twenty-seven years old at the time of her death and had a son and a daughter. He said that the victim told him she was "dancing in a nightclub" in Memphis but that he was unaware of her living arrangements.

Rachel Molica testified that the defendant had been her pimp and was the father of her child. She said she met him after she ran away from home. She said that at the time she met the defendant, she was working as a prostitute on the streets and that she was using rock and powder cocaine. She said she danced and prostituted herself and that he received the profits. She identified the victim as another woman who had worked for the defendant. She said that she and the victim lived with the

defendant in various locations. She said she had lived with the defendant for about three years and the victim had lived with them for about two of those years. She said that a third woman, Carol Hendricks, had lived with them for the last three months of the arrangement and that other women had come and gone. She said there were rules the defendant required them to follow. She said that they brought their money home and gave it to him and that they would ask the defendant if they needed money for clothes or groceries. She said they were not allowed to keep any money for themselves. She said that they were not allowed to talk to other black men and that they could only prostitute themselves to white men. She said the defendant had to know where they were at all times. She said that if they broke a rule, the defendant would become physically violent. She said they were provided with nice clothing, jewelry, and cars.

Ms. Molica testified that in September 2004, she was living with the defendant, the victim, Carol Hendricks, the victim's daughter, and Ms. Molica's daughter. She said that on a Sunday night in September, the children were with a babysitter and that the adults went for a ride around 7:30 p.m. She said everyone was smoking "weed." She said the women usually worked on Sundays, although the defendant had told them they did not have to work that night. She said that they returned to their house and that the defendant told the victim to come into the house. She said that she and Hendricks remained in the truck and that after a few minutes, they could see from shadows inside the house that the defendant had the victim on the ground and was hitting and kicking her. She said that after about ten minutes, the defendant came outside and told them to come into the house. She said she was terrified because she did not know whether she and Hendricks were going to be beaten as well. She said that they went inside and sat on the couch and that the defendant locked the door and continued his assault on the victim. She said that the defendant beat the victim for about four hours. She said that the defendant knocked the victim to the ground repeatedly, kicked her, punched her, pulled her hair, and demanded to know what secret she was keeping from him. She said that the defendant beat the victim with a boot, stomped her, stood on her, picked her up and threw her into a television, hit her with his belt, hit her with a child's chair, and beat her with a wooden cane. She said that during this assault, the defendant extracted information from the victim about an ex-boyfriend with whom the victim had been in touch. She said that about halfway through the assault, the defendant called the ex-boyfriend after learning his name and telephone number from the victim and that the victim was able to pick herself up, speak, and sit on the couch. She said that the defendant learned during the conversation with the victim's ex-boyfriend that the victim had driven the defendant's car to visit the ex-boyfriend and that this enraged the defendant even more.

Ms. Molica testified that after the telephone call, the defendant became more violent and said the victim had not told him the whole story. She said the defendant began beating the victim with his cane. She said the victim told the defendant he was going to kill her, to which the defendant responded, "[D]ie, b----, die." She said the defendant told the victim repeatedly that she "was going to leave in an ambulance or by the morgue." She said the victim was trying to protect her body from the defendant's blows and asked the defendant to stop. She said that at one point, she had helped the victim to her room and that the victim could not hold up her chest. She said she told Hendricks that something was not right because "[the victim's] eyes were fully dilated and you would look at her but there was no one there." She said the defendant resumed the beating and dragged the victim

down the hallway and made her come back into the front room. She said that just before the defendant hit the victim on her head with his cane, the victim said, "God, save me," and the defendant responded, "[Y]our god can't save you."

Ms. Molica testified that during the course of the beating, the defendant took breaks. She said that he became winded and that he removed clothing. When asked why she did not call the police, Ms. Molica explained, "Unfortunately, this wasn't anything new to me." She said that doing so would have been "a violation" and that she did not know the victim was going to die. She said that "[u]sually when [the victim] gets beat up and is hurting, the next day [the defendant] will let me take her to a local ER room."

Ms. Molica said that she and Hendricks left the house at about 1:30 a.m. because they had to pick up the children from the defendant's mother, who was babysitting, and the defendant had told them to go to the grocery store. She said that when they left, the victim was on one of the couches, and that the victim was still there when they returned. She said that she and Hendricks prepared tacos for the defendant and that he slept on another couch near the victim.

Ms. Molica testified that about 10:30 the next morning, she heard the defendant yelling at the victim to get up. She said that the defendant called for her and that she went into the front room. She said the victim was lying on the couch with her eyes open. She said the victim's tongue was white and crusty. She said the victim's breaths were shallow and then stopped within ten seconds. She said that Hendricks had come into the room and that she, Hendricks, and the defendant attempted to stand the victim up but that the victim "was dead weight." She said the defendant became frantic and that they hid a towel the defendant had used to wipe his sweat, the defendant's cane, and the defendant's belt. She said that the defendant told her to call an ambulance, which she did, and that the defendant left. She said she attempted CPR but that "her blood came back up." She said the defendant called her after he left the house to find out what was happening. She said the defendant told her to say that the victim's ex-boyfriend had done this to her and that they had picked up the victim at midnight at Wal-Mart.

Ms. Molica testified that she had lied to the police at first and blamed the victim's ex-boyfriend for the attack but that she eventually told the truth. She said that she was scared and did not want the defendant to be mad at her but that she could not live with trying to "cover up." She said she did not remember whether she had said at the defendant's preliminary hearing that she became truthful only after the police threatened to charge her with a crime.

Ms. Molica identified photographs of the deceased victim on the living room floor. The photographs depicted the victim's injuries, including bruises, abrasions, cuts, and bleeding. She attributed all of the injuries depicted in the photographs to the defendant.

Lieutenant Mark Miller of the Memphis Police Department testified that he was involved in the investigation of the victim's death. He identified a towel that he took from the police department's property room to the Tennessee Bureau of Investigation.

Rickey Davison of the Memphis Police Department testified that he was involved in crime scene investigation of the victim's death and that he photographed the crime scene. He identified photographs of a pink plastic chair that was in the "den area," a towel that was on top of a washing machine in the kitchen, a belt on top of some clothing in a bedroom, and a wooden walking cane. He also identified the chair, cane, and towel as exhibits.

Sergeant Paula Harris of the Memphis Police Department testified that she obtained DNA samples from the defendant. She said that after first storing the samples in the property room, she transmitted the samples to the TBI for testing.

Qadriyyah Debnam, Ph.D, testified that she was employed as a special agent forensic scientist of the serology DNA unit of the TBI Memphis Crime Laboratory. She testified as an expert witness in serology and DNA analysis. She said she analyzed the towel and determined that it contained DNA from both the defendant and the victim. She admitted that DNA could remain on a towel for an "indefinite" period of time and that nothing indicated whether the DNA on the towel had been placed there in September 2004. She said the defendant's and the victim's DNA on the towel were from blood.

Doctor Joye Carter testified as an expert in forensic pathology. She examined the victim's body and determined that numerous injuries were all over the body, including bruises, lacerations, and contusions. She also noted bleeding from the nose, broken ribs, a large laceration of the liver, a lacerated gall bladder, and bleeding inside the brain. She stated that the victim's cause of death was multiple blunt force injuries and that the manner of death was homicide. She said she examined a plastic chair and a wooden cane and that some of the patterns on the objects could be consistent with marks on the victim's body. She said that the cane's handle was broken where it fit into the staff and that she saw what appeared to be blood on it, although she acknowledged a report indicating that a presumptive test performed by the TBI failed to indicate the presence of blood. She said what appeared to be blood was also on the chair. She said a TBI report stated that blood and the victim's DNA were on the chair. She identified photographs of the victim's injuries.

Doctor Carter testified that the examination of the victim's body took place on September 20 and 21, 2004. She said some of the victim's injuries would have become more pronounced with the passage of time. She stated that the injuries appeared to have been inflicted within twenty-four hours of when she began her external examination on September 20.

Doctor Carter said the victim did not have alcohol, marijuana, or other illicit drugs in her system. She did have in her system promethazine, which is a pain medication, and codeine, which is used for pain and coughing.

The jury found the defendant guilty of first degree murder. The trial court imposed a life sentence.

# I

The defendant argues that the evidence is not sufficient to support his conviction of first degree murder. He concedes the sufficiency of the evidence to support a finding of unlawful homicide but claims it can be no greater offense than second degree murder.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

As relevant here, first degree murder is an unlawful "premeditated and intentional killing of another[.]" T.C.A. §§ 39-13-201; -202(a)(1).

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our supreme court has noted the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id. Without sufficient evidence of premeditation, a homicide in Tennessee is presumed to be second degree murder. State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). "'Intentional' means that a person acts intentionally with respect to . . . a result of the conduct when it is the person's conscious objective or desire to . . . cause the result." T.C.A. § 39-11-106(a)(18).

We conclude that the evidence is sufficient to establish that the defendant committed a premeditated and intentional murder. In the light most favorable to the state, the evidence demonstrates that the defendant inflicted a horrific assault on the victim over a period of about four hours. He used various means, including his fists, his feet, a cane, and a plastic chair. His assault

so exhausted him that he had to stop to rest at times and removed clothing when he became too hot. There was proof that after allowing the victim to go to her room with the assistance of Ms. Molica, the defendant forced the victim back into the living room and resumed his assault. The victim pleaded with the defendant that he was killing her, to which he responded, "Die, b----, die." The defendant told the victim repeatedly that she would leave in an ambulance or by the morgue. The defendant taunted the victim that her god could not save her. Although there was evidence that the defendant was enraged during some of the attack, there was also evidence that he stopped to rest, that the attack took place over a period of hours, that he instructed Molica and Hendricks to buy groceries and prepare a meal for him which he was calm enough to eat, and that he was calm enough to sleep in the room with the victim after beating her. The victim was visibly badly injured and had a vacant look, yet the defendant did not summon help and kept her in the home in her injured state for several hours until she finally expired. The defendant had the presence of mind to instruct Ms. Molica and Ms. Hendricks to conceal the physical evidence of his crime, and he instructed Ms. Molica to tell the authorities that someone else had assaulted the victim. From this evidence, rational jurors could conclude that the defendant formed the requisite premeditation to kill the victim and that it was his conscious objective or desire to cause her death.

**II**

The defendant also argues that numerous instances of prosecutorial misconduct deprived him of a fair trial. He claims that several remarks by the prosecutors during jury selection, opening statements, and closing arguments "effectively and repeatedly roused the emotion and passion of the jury in a manner which precluded calm, rational and deliberate decision making by the jury."

Prosecutorial misconduct does not constitute reversible error unless the outcome was affected to the defendant's prejudice. State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001). In Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), this court set out the following considerations for determining if the prosecutor's conduct could have improperly prejudiced the defendant and affected the verdict:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.

2. The curative measures undertaken by the court and the prosecution.

3. The intent of the prosecutor in making the improper statement.

4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.

See State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984) (approving these factors in determining if the misconduct resulted in reversible error).

The state argues, and the record reflects, that the defendant did not raise a contemporaneous objection at trial to any of the prosecution's statements or tactics of which he now complains. Failure to do so ordinarily results in a waiver of the issue. See Tenn. R. App. P. 36(a) (stating that an appellate court is not obligated to grant relief "to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"); State v. Robinson, 146 S.W.3d 469, 511 (Tenn. 2004) (concluding that the defendant waived the issue of improper prosecutorial comments for failing to make a contemporaneous objection). We may, however, review the record for plain error.

Rule 52(b) of the Tennessee Rules of Criminal Procedure provides:

> (b) Plain Error. – When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.

See also T.R.A.P. 36(b).

> This rule by its terms allows plain error review only where there is a failure to allege error in the new trial motion or where the error is not raised before the appellate court. Nevertheless the rule has been interpreted by the appellate courts to allow appellate review under some circumstances in the absence of a contemporaneous objection as well.

State v. Timothy Ryan Badgett, No. M2003-02300-CCA-R3-CD, Houston County, slip op. at 6, n.2 (Tenn. Crim. App. Jan. 5, 2005) (emphasis in original), app. denied (Tenn. May 9, 2005). Our supreme court has adopted the factors developed by this court to be considered

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). An appellate court's exercise of its discretionary authority to notice plain error is to be "sparingly exercised." State v. Bledsoe, 226 S.W.3d 349, 354 (Tenn.

2007). In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the [proceedings]," and "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." Adkisson, 899 S.W.2d at 642.

## A. Jury Selection

The defendant contends that during jury selection, the prosecutor improperly "planted the idea" that the jury was required to provide the victim with a fair trial and that the prosecutor's grammatical construction was "problematic." The state argues that both it and the trial court repeatedly informed the jurors that they were to decide the case based solely upon the facts and the law and that the questioning was not improper given the defense tactic of disparaging the victim's lifestyle.

The defendant's brief cites to a portion of the transcript at which the prosecutors asked a prospective juror, "And can you give [the victim] a fair trial just like you'd give the defendant a fair trial?" The defendant argues that there is no precedent for a victim, as well as a defendant, to be afforded a fair trial. He also argues that the prosecutor's grammatical construction in inquiring whether the prospective jurors "could" give the victim a fair trial just like it "would" give the defendant a fair trial was improper because it suggested that the jurors could decide whether it would or would not do these things and because it did not advise the prospective jurors of the defendant's right to a fair trial.

Upon examination of the prosecution's questioning in context, it is apparent that the state's questioning was aimed at determining whether the prospective jurors would be able to decide the case without discounting the victim's death because of the lifestyle she led as a topless dancer and prostitute. The defendant's right to a fair trial was repeatedly mentioned in the voir dire. The prospective jurors were advised of the law by the court and are presumed to have followed the court's instructions. State v. Reid, 164 S.W.3d 286, 346 (Tenn. 2005) (appendix). We disagree with the defendant that the questioning was improper or prejudicial. See State v. Robinson, 146 S.W.3d 469, 520 (Tenn. 2004) (holding that prosecutor's comments during voir dire about the homicide victim being the "other person" in the courtroom in conjunction with comments about defendant's right to fair trial were not error). Because we conclude that no error occurred, the defendant is not entitled to plain error relief.

## B. Opening Statement

The defendant also argues that the state's opening statement was improper when the prosecutor said

> At the conclusion of this proof the State is going to ask you, jury of this point of thirteen women and one man, and that's how it should be, that's how it should be because Michelle Berry's life had

been controlled for too long by men. And by this man. It's proper for this jury and for the State to ask this jury at the conclusion of [its] proof to say no woman should die like this and to render the verdict that truth dictates and justice demands, ask that this defendant is guilty of beating this woman with his own hands to death.

The defendant alleges that this portion of the opening statement was an exhortation to the majority of female jurors to do their duty as women and convict the male defendant. The defendant characterizes the argument as a "blatant appeal to sexist discriminatory impulses in the women on the jury."

Upon review, we conclude that the prosecutor's reference to the gender composition of the jury panel and alternates was not prudent. We disagree, however, that the reference rose to the level of exhorting the jury to return a gender-based verdict against the defendant. Cf. State v. Johnson, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996) (holding that the defendant did not demonstrate prejudicial error from the prosecutor's "imprudent" references to defendant as "the black man named Tim" to an all-white jury). We hold that the defendant is not entitled to plain error relief.

## C.    Closing Argument

Most of the defendant's prosecutorial misconduct argument relates to comments made during closing argument and rebuttal argument. The defendant's complaints with respect to closing argument are:

> (1) The state improperly attempted to invoke sympathy for the victim based upon a lifestyle that the prosecutor said he could not comprehend.

> (2) The prosecutor improperly injected personal opinion by "profess[ing] his knowledge of the deceased and her 'problems.'"

> (3) Predicting that the defense was going to ask the jury to discount the case based upon the victim's chosen lifestyle.

With respect to rebuttal argument, the defendant argues

> (1) The prosecutor improperly urged the jury not to discount the victim's life by suggesting that she would have made a significant contribution to society had the defendant not killed her. The prosecutor referred to a statement that had been made during voir dire by a prospective juror that she had taught pharmacy technician students who were dancers who became A students and turned around

-9-

their lives and having mischaracterized the statement as referring to topless dancers and prostitutes who someday become pharmacists.

(2) The prosecutor reminded the jury to decide the case in a cool, calm, rational manner, and then proceeded to invite the jury to put itself in the place of the victim.

(3) The prosecutor belittled the defendant's closing argument by stating, "Reckless homicide, give me a break."

The Tennessee Supreme Court has recognized that "argument of counsel is a valuable privilege that should not be unduly restricted." Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). Attorneys have great leeway in arguing before a jury, and the trial court's broad discretion in controlling their arguments will be reversed only upon an abuse of discretion. Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001). However, closing argument must be "temperate, must be predicated on evidence introduced during the trial of the case and must be pertinent to the issues being tried." Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976).

Upon review of the defendant's complaints in context of the state's entire argument, we are not convinced that any of these remarks were harmful. The defendant's theory of the case was that he did not premeditate the victim's death and therefore was guilty of a reckless homicide, a lesser included offense of first degree murder. Defense counsel focused on many of the lurid details of the victim's lifestyle in its examination of witnesses and argued that the victim's lifestyle choice carried with it certain consequences. The following portion of the defendant's closing argument is telling as to the defense theory of the case:

> Mr. Oliver along [with] all the other players in this group of folk that we've heard about during this trial have to be held responsible for their conduct. Everyone who was involved in this alternative life-style, I will call it, participated voluntarily. Everybody had a role to play. It's not a life-style that most folk would follow agree [sic] with. But there are consequences for our conduct. If we heard that Evil Knevil got killed on his motorcycle jumping, attempting to jump forty cars, I don't know if anybody would be really surprised considering the inherent dangers that goes [sic] along with that occupation.

> I don't want to be misconstrued. No, I am not suggesting that Ms. Berry deserved to die . . . because she chose to have a life-style. No one deserves to die. But we all have to be held accountable for the decision that we make. You see when you cho[o]se to live a life of prostitution and drugs and as Ms. Molica said, driving luxury cars

-10-

and wearing fine clothes, that life-style carries a certain element of violence with it that everyone is aware of on the front end.

You have to be held responsible for the consequences of your own acts even if those consequences result in one's demise. Mr. Oliver has got to be held for the consequences of his conduct. What this case has shown is that Mr. Oliver is guilty of an intentional aggravated assault but the death was not contemplated. . . . It was violence that went along with the life-style as [Ms. Molica] testified.

In light of the defendant's theory of the case, we are not convinced that the state's closing or rebuttal arguments were outside the bounds of acceptability. The victim's character and lifestyle were at the forefront of the defense. The state's argument that the jury should not be swayed to discount the defendant's level of culpability by the evidence of the victim's character and lifestyle was appropriate given the nature of the case. We acknowledge that the prosecutor did mischaracterize the statement by a prospective juror about dancers going on to become pharmacists. The prospective juror taught in a pharmacy technician program and said that some of her students were "dancers" who became "A students." However, this difference is inconsequential given that the import of the state's argument was that the jury should not discount the crime based upon the victim's status as a prostitute and topless dancer. In summary, we are not convinced of plain error.

## D.     Cumulative Error

The defendant argues that the various allegations of prosecutorial misconduct viewed together constitute plain error. Because we have not found any individual prejudicial error, there is no accumulation of errors amounting to plain error.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE

-11-